This appeal comes from the Circuit Court of Calhoun County. The defendant below appeals from a verdict and judgment in favor of the plaintiff in the amount of $2,250.
The complaint contained two counts: one for conversion and the other for fraud. Defendant denied the allegations of the complaint and filed a counterclaim for a deficiency judgment on a promissory note owed by the plaintiff. Plaintiff denied the contentions of the counterclaim, and after a pretrial hearing the case was tried to the court and a jury. The defendant's motions for directed verdict, judgment n.o.v., and new trial were denied by the trial court. The defendant appeals, contending that these rulings as well as the judgment on the merits were erroneous and a reversal is due to be entered. The underlying premise for the contention of error in the various rulings is that the record is devoid of any evidence that a conversion of the personalty was accomplished.
The evidence reveals that in March 1974 plaintiff (hereinafter "Witcher") financed the purchase of a 1974 Ford pickup truck through the appellant, Bank of Huntsville (hereinafter "Bank"). Witcher executed a promissory note and security agreement for a total amount of $3,308.55 to be paid in thirty-six installments of $110.34 per month, with each payment due on the sixth day of the month. Payments were to commence in May 1974.
A payment was made on May 10, 1974, and another on June 17th. In July 1974 Witcher obtained an extension of that month's payment. The next payment was made on August 24, 1974. In September 1974 Witcher again requested by telephone an extension of the September payment; he made no further payment until after being notified that the extension had been granted. Thereafter payments were made on October 21, December 5, December 17, 1974 and January 25 and February 21, 1975. No other payments were ever made.
Witcher testified that on March 1, 1975 he called the Bank to request an extension or a rearrangement of his payment schedule. The transcript of his testimony on this point is as follows:
 "A. I told the gentleman that I was having financial trouble, the doctor bills, the hospital bills, drug bills, and then everything else, all the other expenses coming due, and I just couldn't make it. I asked the gentleman if there was any way he could set me up — my loan up on a six month basis, or six months, just making the note came [sic] due or if there was any way he could lower the payments at that time. And the gentleman I was talking to said he really didn't know, he would have to talk to someone else in the bank, and that he would get back with me. He said he would write a letter and tell me what the bank could and couldn't do. At that time he said, `You're not in any real trouble. You're only 95 cents behind on your payment.' And he said, `That 95 cents is nothing you could really worry about,' and that was it. He did tell me he would write a letter and tell me what the bank could and could not do."
Witcher stated that he did not make the March or April payments because he was waiting to hear from the Bank.
On April 11, 1975 the Bank repossessed the Ford truck. Testimony for the Bank was that Witcher had been notified by letter prior to the repossession that the truck would be repossessed unless the amounts unpaid were paid within ten days. Witcher denied receiving such a letter.
There was also testimony that the Bank notified Witcher that his truck had been repossessed, and that it would be sold, and that the proceeds would be applied to reduce the outstanding indebtedness. After the sale of the truck there was a deficiency owing to the Bank of $188.09. The Bank's counterclaim sought the payment of this sum.
At the time the Bank informed Witcher that it had repossessed the truck, it sent *Page 1387 
him a package containing items of personal property taken from the truck, along with an itemized list of those articles of property. There was no wearing apparel in the package nor were such items listed on the inventory. Witcher alleged that there were certain articles of clothing in the truck at the time of repossession which were worth about $210.00. The Bank's agents testified there was no clothing in the truck at the time of repossession.
The evidence showed that Witcher's loan was two months in arrears at the time the truck was repossessed. The note and security agreement signed by Witcher were introduced into evidence. The security agreement contained provisions authorizing acceleration of the loan and repossession of the collateral in the event of default.
The Bank's first contention of error is that the first count of the complaint alleging conversion of the truck and clothing was not proven by the evidence. The Bank is correct in its position that a secured party may, on default, take possession of the collateral without judicial process if this can be done without a breach of the peace. Title 7A, Section 9-503, U.C.C.
In the case at bar the Bank held a security agreement which authorized it to take possession of the Ford pickup in the event Witcher failed to make the monthly payments as previously agreed. The evidence is without dispute that Witcher had failed to remit to the Bank the payments due on March 6 and April 6, 1975 and was therefore in default on April 11, 1975 when the Ford pickup truck was repossessed. There is no hint in the evidence of a breach of the peace committed during the repossession. Thus, repossession by the Bank of the 1974 Ford pickup truck was not a prima facie violation of law.
However, the issue before us is whether the Bank's conduct was such that Witcher had a right to believe that his requested extension would be granted, or that late payments would be accepted and the truck would not be repossessed without further contact from the Bank, so that the Bank is now estopped from asserting its statutory and contractual right to demand payment in full and repossess the collateral without notice to Witcher. We hold that under the facts of this case the jury could properly find that the Bank is estopped from making such election and repossessing the security without giving prior notice to the purchaser and that therefore seizure of the 1974 Ford pickup truck was a conversion of said collateral.
Estoppel has been defined by one court, in dealing with a case similar to the one before us, as: (1) knowledge of the facts by the party to be estopped; (2) intention by the party to be estopped that its conduct be acted upon, or such party acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) ignorance by the party asserting estoppel of the true facts; and (4) injurious reliance by the party asserting estoppel on the conduct. Varelav. Wells Fargo Bank, 15 Cal.App.3d 741, 93 Cal.Rptr. 428
(1971). This definition is in accord with the Alabama cases. See, e.g., Mooradian v. Canal Ins. Co., 272 Ala. 373, 378,130 So.2d 915 (1961); Ellison v. Butler, 271 Ala. 399, 124 So.2d 88
(1960).
We think there is sufficient evidence here to warrant the jury's finding that Witcher believed an extension had been granted. In a similar case, Varela v. Wells Fargo Bank, supra, the purchaser of an automobile under a contract of conditional sale had a record of sporadic payment, with some payments being made at the first of the month, some in the middle and some at the last of the month. The creditor-bank's records were in considerable confusion, with discrepancies between the bank's computer record and the record of payments noted by the bank in the purchaser's payment coupon book. The court found that although the purchaser had received three notices that she was delinquent in her payments, her subsequent conversation with the bank in attempting to ascertain the amount of the delinquency, her promise that she would "get the money," and the bank's failure to *Page 1388 
make further contact with her after that conversation reasonably led the purchaser to believe that she was being given time to pay the delinquent installment. Noting that the repossession "must have struck her out of a clear sky," the court held that there was an implied estoppel on the part of the bank from seizing possession of the vehicle.
In the case before us, Witcher testified that he talked with someone at the Bank and requested a modification of his schedule of payment, either by extending the payments or by reducing the amount of each payment. The Bank was not able to refute the allegation that the conversation took place and it was for the jury to decide whether that conversation did in fact occur. The jury, by its verdict, evidently concluded that the conversation did take place. Thus, we must take the conversation as a matter of fact.
Witcher does not contend that the person at the Bank with whom he talked actually granted Witcher an extension or in any other way affected Witcher's obligation to repay the loan. Rather, his position is that he was told he would be notified by letter as to what future pattern of payment the Bank expected. Witcher testified that in reliance upon this statement he took no further action in the matter. Witcher further testified that this was the same course that had been followed in making a prior request for an extension; after making the request by telephone, Witcher had not made a payment until notified by letter that the extension had been granted. There was no testimony as to the lapse of time between the oral request and receipt of the extension. Although we are mindful of the ease with which debtors can allege facts such as those involved in this case, we do not think, in light of this purchaser's past dealing with this creditor, that it was unreasonable of Witcher to expect that he would receive some sort of communication from the Bank as to the status of his loan and the payments he was required to make. Nor was there any particular reason for Witcher to suspect that this request for an extension would be denied, since each of his prior requests for extensions had been granted.
Even had Witcher not been justified in thinking an extension would be granted, we think the Bank was estopped in this instance from repossessing the pickup without prior notice to Witcher. The Bank produced a letter dated March 29, 1975, allegedly mailed to Witcher making a demand for payment and stating that the truck would be repossessed in absence of payment. However, an employee of the Bank admitted the possibility that the letter had never been sent, and Witcher denied receiving the letter. Thus, the evidence would support a conclusion that the Bank did not notify Witcher of the impending repossession.
In Ford Motor Credit Co. v. Waters, 273 So.2d 96 (Fla.App. 1973), the Florida court held that where a purchaser of an automobile under a conditional sale contract had established an irregular pattern of payments which deviated from the terms of the original contract, and the creditor's conduct was such as to lead the purchaser to believe that late payments would be accepted, and that the purchaser would be allowed to catch up the payments in arrears, then the creditor could not thereafter repossess the automobile without notice and without demand for the unpaid balance of the purchase price. The purchaser could rightfully rely upon the past course of conduct and a concomitant duty by the creditor to notify the buyer prior to its changing the pattern by retaking the property.
The record of Witcher's payments in the case before us indicates that only one payment was made prior to the sixth of the month, when payments were due. A Bank employee testified that every payment was received late. Thus, the Bank certainly was aware of the delinquent payments, yet apparently it made no objection. We conclude, therefore, that the Bank's past pattern of conduct in accepting late payments now estops it from repossessing Witcher's pickup truck without giving notice and *Page 1389 
making a demand for payment, and that its seizure of the truck constituted a conversion thereof.
Witcher also alleged that he had $210 worth of clothing in the truck at the time of the repossession to which the Bank had no claim, and that this property was taken by the agents of the Bank. The Bank contends that there was no clothing in the truck at the time of the repossession and that it did not take such clothing into its possession.
The Bank's security agreement did not give it any claim to or control over clothing that might have been in the truck; therefore a jury question was presented as to whether there was clothing in the truck at the time of repossession and whether or not such clothing was converted by the Bank to its use. The jury, by its verdict, could be said to have concluded that clothing was in the truck and was converted by the Bank to its use.
The Bank's second allegation of error is that Count Two of the complaint, i.e., the fraud count, is not supported by the evidence and therefore would not support the verdict. The pertinent part of Count Two is as follows:
"COUNT TWO
 "(1) On and prior to April 11, 1975, Defendant and Plaintiff had been negotiating and discussing the matter of Plaintiff's indebtedness to Defendant, which was secured by a chattel mortgage on a 1974 Ford Explorer Pick-Up Truck.
 "(2) During said discussions, Defendant, acting by and through its officers, agents or employees, represented to Plaintiff that Plaintiff would be notified of a new schedule of payments to be made by Plaintiff for the discharge of said indebtedness; and Defendant so acting represented to Plaintiff that he would be notified of said new schedule of payments before Defendant took any legal action regarding said indebtedness, or expected further payments from Plaintiff on said indebtedness." (Emphasis added.)
The supreme court in Mangina v. Bush, 286 Ala. 90,237 So.2d 479 (1970), said:
 "Fraud is never presumed and when relied upon must be distinctly alleged and proven, . . . and he who seeks relief on ground of fraud has the burden of proof."
As can be readily seen from the quoted portion of Count Two of the complaint, Witcher alleged that the Bank had promised prior to repossession that he would be given a new schedule of payments for the discharge of his indebtedness and that this would be done before any legal action was taken to enforce the debt; also he was not expected to make further payments on said indebtedness until he received the new schedule of payments.
The only proof in the record relating to what the Bank's agent told Witcher is quoted above. A careful reading of that statement alleged to have been made by the Bank's agent shows that Witcher was promised only that the Bank would notify him whether it would or would not alter the schedule of payments or adjust the indebtedness in some other fashion; never did it promise him that he would receive a new schedule of payments, nor was he promised that the Bank would not take action on the indebtedness until he received the new schedule of payments. Furthermore there is no evidence in the record that Witcher was told that the Bank did not expect him to continue making payments of his existing indebtedness.
We are convinced that the evidence does not support the allegation of fraud made in Count Two; therefore, Witcher failed to sustain the burden of proof that had been placed on him as to this count. Such a conclusion, however, does not require a reversal of this case, for it has been held that where the complaint contains two or more counts and the jury returns a general verdict for the plaintiff, the verdict will be referable to the count that is supported by the evidence.Thrasher v. Darnell, 275 Ala. 570, 156 So.2d 922 (1963). *Page 1390 
In the case at bar, we have decided that there was sufficient evidence in the record to support the conversion count, hence the verdict will be referable to that count.
No reversible error having been presented, the judgment of the trial court is affirmed.
AFFIRMED.
WRIGHT, P.J., and HOLMES, J., concur.