**THE FIRST NATIONAL BANK OF ALEXANDER CITY,**
Plaintiff–Appellee,

v.

**AVONDALE MILLS BEVELLE EMPLOYEES FEDERAL CREDIT UNION, in liquidation, Defendant–Appellant.**

No. 91–7436.

United States Court of Appeals,
Eleventh Circuit.

Aug. 4, 1992.

Leonard N. Math, Trimmier, Atchison & Hayley, P.C., Montgomery, Ala., for defendant-appellant.

Laurence D. Vinson, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiff-appellee.

Before EDMONDSON, Circuit Judge, RONEY *, and GIBSON **, Senior Circuit Judges.

FLOYD R. GIBSON, Senior Circuit Judge:

The National Credit Union Administration Board, as successor in interest to the Avondale Mills Bevelle Employees Federal Credit Union ("the credit union"), appeals the district court's grant of summary judgment to the First National Bank of Alexander City ("First National"). We reverse and remand.

## I. BACKGROUND

Rebecca Caldwell was the credit union's manager, secretary and treasurer, as well as a member of its board of directors. For several years, she was also the credit union's only full-time employee. On August 15, 1989, First National loaned Caldwell forty thousand dollars. This loan was evidenced by a promissory note that was due on February 11, 1990. Two weeks later, First National loaned Caldwell an additional ten thousand dollars. The second loan was also evidenced by a promissory note that was due on February 11, 1990.

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable Floyd R. Gibson, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

In conjunction with her first loan, Caldwell offered First National a share certificate of deposit ("CD") from the credit union in the amount of $60,000 as collateral. Caldwell signed a form entitled "Assignment of Savings/Time Deposit Account," which purported to assign her interest in the share CD to First National as security for the loan. At the same time, she conveyed the share CD to First National. Caldwell signed a second form when the second loan was made, thereby allowing the share CD to serve as collateral for both loans. Both forms contained a space for the credit union to verify the existence and amount of the share CD, but neither verification was ever requested or supplied. First National did send a letter to the credit union informing it First National had taken the share CD as collateral for the August 15 loan and requested the letter be acknowledged. The letter was acknowledged by Sharilyn Nolen, a part-time teller at the credit union. First National did not send another letter in conjunction with Caldwell's second loan.

On February 12, 1990, new notes were executed in the amount of $40,000 and $10,000, respectively. The new notes were due on August 11, 1990. First National did not inform the credit union Caldwell's loans had been renewed.

The share CD appeared to have been issued on July 6, 1989 and was to mature one year later. The face of the document contained provisions for extending the maturity date and also contained a clause stating the depositor could not transfer or assign the certificate or any rights under it without the credit union's written consent. The share CD appeared to have been issued to Caldwell, and was signed on behalf of the credit union by Sharilyn Nolen. In reality, Caldwell had taken a blank share CD certificate, filled it out, and instructed Nolen to sign it. She also instructed Nolen to fill out the form sent by First National acknowledging the bank's acceptance of the share CD as collateral on Caldwell's loans. Caldwell never paid the credit union

the $60,000 as represented by the share CD.

In June 1990, a National Credit Union Administration examination uncovered discrepancies in the credit union's books. A subsequent investigation and audit revealed Caldwell had been embezzling funds since at least 1987, and the credit union's members' losses were calculated in excess of $900,000. On August 31, the National Credit Union Administration Board placed the credit union in liquidation.

Caldwell did not repay the money she borrowed from First National.[1] Near the end of August 1990, First National approached the credit union and demanded payment for the share CD. The credit union refused. First National filed suit against the credit union in state court, and the National Credit Union Association Board ("NCUA") removed the case to federal court.[2] Both parties filed motions for summary judgment; the district court denied the NCUA's motion and granted First National's, holding that Caldwell had rights in the collateral sufficient to grant First National a valid security interest. The court also held that Nolen's signature and return of First National's acknowledgement form constituted approval on behalf of the credit union as required by the language on the face of the share CD. The NCUA appeals.

## II. DISCUSSION

### A. Rights in the Collateral

First National's claim is premised on the validity of the security agreement between itself and Caldwell. The security agreement is enforceable only if:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral and in addition, when the security interest covers crops growing or to be grown or timber to be cut, a description of the land concerned; and

(b) Value has been given; and

---

1. Caldwell died in June 1990.

2. *See* 12 U.S.C. § 1789(a)(2) (1988).

(c) The debtor has rights in the collateral.

Ala.Code. § 7–9–203(1) (1984). The key to the present dispute lies in the third element listed above; namely, did Caldwell have rights in the share CD when the security agreement was entered?

█ The term "rights in the collateral" is not defined in the Uniform Commercial Code or in Alabama's statutes. We have observed that "rights in the collateral" is not the same as ownership, a person may pledge property that is owned by someone else, and a person possessing voidable title has sufficient rights in the collateral to make an enforceable pledge. *In re Atchison*, 832 F.2d 1236, 1239 (11th Cir.1987). Nonetheless, as a thief, Caldwell had no rights in the share CD. *First National Bank of Mobile v. Pope*, 270 Ala. 202, 117 So.2d 174, 177 (1959); *Stathem v. Ferrell*, 267 Ala. 333, 101 So.2d 546, 549 (1958); B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 2.04 (2d ed. 1988). Though Caldwell was a prolific thief, the fact remains that as a thief her title was void and she had insufficient rights to grant an enforceable security interest in the share CD.[3]

█ The district court's legal conclusion relied heavily on a single sentence from NCUA's amended motion for summary judgment, which the court construed as an admission that Caldwell had rights with respect to the share CD. Paragraph three of the motion was a summary of facts supported by the record. The first sentence of paragraph 3(f) stated: "Said Share Certificate of Deposit No. 2021 was nonnegotiable and represented the purchase of equity in the credit union." The district court relied on this sentence to "find[ ] that [the NCUA] has admitted that Ms. Caldwell owned an equity interest to the extent of $60,000.00 in the Credit Union as evidence by the CD...." *First Nat'l Bank of Alexander City v. Avondale Mills Bevelle Employees Credit Union*, No. 90V–1054–E, slip op. at 5 (M.D.Ala. March 21, 1991).[4] However, paragraph 3(f) continued to state that Caldwell "had no right to transfer or assign such equity interest in the credit union without the written consent of the credit union to assign or transfer the same." Additionally, paragraph 3(e) averred Caldwell "did not have a Share Certificate of Deposit No. 2021 at the Defendant credit union nor did she deposit $60,000 for the purchase of such a Share Certificate of Deposit. As a matter of law, [Caldwell] had no rights in the purported collateral...."

First National echoes the district court's reasoning and contends the first sentence of paragraph 3(f) constitutes a judicial admission by the NCUA that Caldwell had an interest in the share CD. The NCUA argues, as it did in the district court, that the sentence read in context simply describes the legal effect of a person possessing a share CD and explaining why the credit union's consent to transfer or assign the share CD was required. The NCUA also points out that the district court's interpretation renders paragraph 3(e) a nullity, and the NCUA would not have taken such contrary positions.

In *Pollock v. Birmingham Trust Nat'l Bank*, 650 F.2d 807 (5th Cir. Unit B July 1981), the former-Fifth Circuit[5] addressed whether a letter from an attorney could be properly construed as abandoning one of

---

3. Ala.Code § 7–3–406 (1984) (negligence contributing to alteration or unauthorized signature) and § 7–3–305 (rights of a holder in due course) apply only to instruments which, in the contexts of those sections, is defined as a negotiable instrument. Ala.Code § 7–3–102(e) (1984). These provisions do not apply to this case because the parties (correctly) agree the share CD is not a negotiable instrument.

4. A certificate of deposit is typically understood to be a deposit in a bank, creating a debt- or/creditor relationship. 5B Michie on Banks and Banking ¶ 313 (1991). However, a share CD issued by a credit union represents an equity interest in the credit union. 12 U.S.C. § 1757(6)(B) (1988).

5. The Eleventh Circuit has adopted the former-Fifth Circuit's decisions as binding precedent. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

the plaintiff's two theories of liability. *Id.* at 810. The court held that

> [a] single sentence in a short letter, equally susceptible to an interpretation that a claim is being abandoned as it is to an interpretation that it is not, cannot operate to terminate that claim over objection. There must be something more, either in the way of conduct or declared intentions, before we can ignore a party's own interpretation of the meaning intended.

*Id.* at 811. Similarly, the single sentence relied on by the district court in this case is amenable to two interpretations. It could be an admission, as construed by the court; on the other hand, it could be a statement about what share CDs are supposed to represent when they are paid for as required—which is the NCUA's interpretation. In light of the remaining portion of paragraph 3(f), the contents of paragraph 3(e), and the undisputed facts regarding Caldwell's actions with respect to the share CD, we hold the district court abused its discretion in construing the first sentence of paragraph 3(f) as an admission that Caldwell had rights in the share CD. *See American Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 227 (9th Cir.1988) (applying abuse of discretion standard to district court's decision not to treat statements in counsel's brief as binding admission).

### B. Estoppel

First National argues the judgement can be affirmed because the credit union is estopped from asserting any of its rights to the share CD. It contends estoppel is an appropriate basis for affirming the judgment because Nolen returned the acknowledgement form and the credit union failed to implement measures to prevent Caldwell from committing fraud and embezzlement.

■ Alabama law provides that a true owner may be estopped from asserting his claim of ownership. *Mixon v. Whitman,* 279 Ala. 249, 184 So.2d 332, 339–40 (1966) (owner estopped from asserting title when he left automobile with an automobile dealer "with authority to display" with other cars but with no authority to sell when dealer sold to a good faith purchaser, notwithstanding proper filing of chattel mortgage); *see also* Ala.Code § 7–1–103 (1988). However, the district court did not base its judgment in favor of First National on estoppel grounds, and the record does not clearly indicate First National is entitled to judgment as a matter of law based on a theory of estoppel.

■ "The purpose of estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders [that assertion] contrary to equity and good conscience." *National Fire Ins. Co. v. Housing Dev. Co.,* 827 F.2d 1475, 1480 (11th Cir.1987) (citations and quotations omitted). The four essential elements of estoppel under Alabama law are " '(1) knowledge of the facts by the party to be estopped; (2) intention by the party to be estopped that its conduct be acted upon, or such party acts so that the party asserting estoppel has a right to believe that the conduct is so intended; (3) ignorance by the party asserting estoppel of the true facts; and (4) injurious reliance by the party asserting estoppel on the conduct.' " *Id.* (quoting *Bank of Huntsville v. Witcher,* 336 So.2d 1384, 1387 (Ala.Civ. App.1976)). The injury suffered by the party asserting estoppel must be a "material change of position caused by reasonable reliance upon the party to be estopped." *Id.* at 1481. Nolen's conduct is certainly relevant in determining whether the credit union is estopped from asserting its title to the share CD, but it is not conclusive. In particular, we note that First National did not require a signature on the form intended to verify the existence and amount of the share CD, and the NCUA contends First National did not conduct a credit check on Caldwell. Both these facts may, depending upon the addition of facts not currently in the record, bear on the reasonableness of First National's reliance on Nolen's signature on the acknowledgement form. Though the district court did find Nolen's signature and return of the acknowledgment form constituted approval from the credit union as required by the language on the face of the share CD, the

court did not discuss (or purport to discuss) the other elements of estoppel.

 First National contends the record supports estoppel because it shows the credit union failed to properly supervise and control its employees, as evidenced by Caldwell's lengthy and costly history of malfeasance. A party can be estopped only if it has, through words, conduct or silence, made a misleading communication with the intent that the communication be relied upon. *General Elec. Credit Corp. v. Strickland Div. of Rebel Lumber Co.,* 437 So.2d 1240, 1243 (Ala.1983). Even if the credit union could be said to have been negligent in supervising Caldwell and in failing to prevent her misdeeds, such negligence simply does not constitute a "communication" to First National. Though Caldwell held an important position at the credit union and had never been caught stealing from her employer, these facts did not communicate to outsiders that Caldwell owned the share CD at issue in this case. The credit union's only possible communication to that effect was Nolen's signature on the acknowledgement form; on remand, this communication must be analyzed in accordance with the other factors identified in *National Fire Ins. Co.*

## III. CONCLUSION

We reverse the district court's holding that Caldwell had rights in the share CD and that First National had an enforceable security interest in the share CD. We remand to the district court for further proceedings to determine whether the credit union should be estopped from asserting its title to the share CD.

**REVERSED and REMANDED.**