**MOORE EQUIPMENT COMPANY,**
Appellant,

v.

**H.H. HALFERTY d/b/a H.H. Halferty and Sons and Ford Motor Credit Co. Respondents.**

No. WD 53772.

Missouri Court of Appeals,
Western District.

Feb. 24, 1998.

Motion for Rehearing and/or Transfer to Supreme Court March 31, 1998.

Application for Transfer Sustained May 26, 1998.

Case Retransferred Dec. 22, 1998.

Court of Appeals Opinion Readopted Dec. 29, 1998.

Michael P. Healy, Kansas City, for appellant.

Duane J. Fox, Kansas City, for respondent, H.H. Halferty, H.H. Halferty and Sons.

Keith J. Shuttleworth, Kansas City, for respondent, Ford Motor Credit Co.

Before ELLIS, P.J., and HOWARD and RIEDERER, JJ.

RIEDERER, Judge.

Moore Equipment Company appeals the grant of summary judgment in favor of Respondents. We reverse the grant of summary judgment to Respondents, grant summary judgment in favor of Appellant and remand to the trial court for determination of damages.

## I. Facts

On February 13, 1990, Moore Equipment Company, Appellant, entered into a transaction which it believed was for the sale of a

John Deere combine, serial # 615939, to one M.N. Nance ("Nance"). Appellant executed two documents to accomplish this purported sale: a customer purchase order dated February 13, 1990; and a variable rate loan contract / security agreement dated February 15, 1990. Appellant never actually dealt in person with Nance in this transaction. Rather, Appellant dealt with David McConkey ("McConkey") who represented to Appellant that he was acting on behalf of Nance. Once the papers were drawn up, McConkey told Appellant he was delivering the papers to Nance for Nance to sign. McConkey then forged Nance's signature on both of the documents and returned them to Appellant. Nance was unaware of the purported sale of the combine. Appellant, believing that Nance had signed the documents, delivered the combine to Nance's property in Gentry County. McConkey then took possession of the combine, a fact unknown to both Nance and Appellant. Meanwhile, on February 20, 1990, a financing statement was filed with the Recorder of Deeds in Gentry County, perfecting the security agreement.

After taking possession of the combine, McConkey entered into a transaction with Respondent, H.H. Halferty & Sons ("Halferty") who, like Appellant, was an equipment dealer. McConkey wanted to borrow money from Halferty and use the combine as collateral. However, instead of making an agreement for McConkey to borrow money from Halferty, McConkey and Halferty entered into a retail installment sales contract in July of 1991, which purported to sell this same combine from Halferty to McConkey. Halferty never owned this combine. Nevertheless, the retail installment contract purported to grant Halferty a security interest in the combine. The contract, including the security interest, was then immediately assigned by Halferty to Respondent, Ford Motor Credit Co. ("FMC").

Nance never made any payments under the first contract of sale, since he did not know it existed. The account went into default, at which time Moore attempted to repossess the combine. However, Moore was unsuccessful in its attempt to repossess the combine, since the combine had already been repossessed by FMC. FMC and Halferty had repossessed the combine because McConkey had defaulted on payments he owed to Halferty and FMC under the July 1991 contract. FMC and Halferty jointly repossessed the combine on approximately March 26, 1992.

## II. Procedural Background

In July of 1994, Moore filed a petition suing Halferty and FMC for conversion. At that time the parties to the suit did not yet know that McConkey had forged Nance's signature. In January of 1996, Moore moved to amend the petition to add Nance as a defendant. Appellant's first amended petition alleged four claims against Nance, arising out of the purported sale. Nance then disclosed by affidavit that he did not sign the sale documents; that his signatures were not made with his knowledge and authority; that he was unaware of a transaction involving the combine; and that McConkey forged his signature. After these revelations, Moore dismissed the claims against Nance, and motions for summary judgment pursuant to Rule 74.04 were filed by Appellant and by Respondents. The trial court denied Moore's motion for summary judgment and granted Halferty and Ford's summary judgment motions. The trial court did not specify its reasons for this decision, simply stating "Plaintiff's motion for Summary Judgment is denied. Defendant H.H. Halferty, d/b/a H.H. Halferty and Sons and defendant Ford Motor Credit Company Motions for Summary Judgment are granted. Judgment in favor of defendants and against plaintiff." This appeal ensued.

## III. Standard of Review

Our review of summary judgment is essentially *de novo*. *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993); *Williams v. City of Independence*, 931 S.W.2d 894, 895 (Mo.App.1996). The record is viewed in the light most favorable to the party against whom summary judgment was entered, and that party is afforded all reasonable inferences derived from the evidence. *Id.* If the reviewing court determines that no genuine issues of material fact exist and the movant

has a right to judgment as a matter of law, the judgment will be affirmed on appeal. *Id.* "Where, as here, the trial court grants summary judgment without specifying the basis upon which it was granted, we will uphold the summary judgment if it is appropriate under any theory." *Baldwin v. Jim Butler Chevrolet, Inc.*, 926 S.W.2d 555, 557 (Mo.App. 1996) (*citing Southwestern Bell Yellow Pages v. Robbins*, 865 S.W.2d 361 (Mo.App.1993)). Further, a trial court's order is presumed to have based its decision on the grounds specified in Respondents' motions if the trial court's order does not set forth its reasoning. *McDowell v. Waldron*, 920 S.W.2d 555, 562 (Mo.App.1996).

### A. Rule 74.04—Summary Judgment

Appellant claims the trial court erred in granting Respondents' summary judgment motions for a number of reasons. First, Appellant contends that the trial court erred because Respondents' summary judgment motions do not comply with Rule 74.04(c)(1).[1] Specifically, Appellant claims that Halferty and FMC's motions fail to set forth each material fact in separately numbered paragraphs and fail to specifically reference supporting documentation. The record reveals this to be the case. Halferty's summary judgment motion includes a separate supporting memorandum. FMC's motion incorporates the motion suggestions and facts of Halferty's motion for summary judgment.

■ "The purpose underlying the requirements of Rule 74.04 is threefold: to apprise the opposing party, the trial court and the appellate court of the specific basis for the movant's claim of entitlement to summary judgment." *Miller v. Ernst & Young*, 892 S.W.2d 387, 389 (Mo.App.1995) (*citing Johns v. Continental Western Insurance Company*, 802 S.W.2d 196, 197 (Mo.App. 1991)). A motion which fails to meet the specificity requirement of Rule 74.04(c) is deficient. *Moss v. City of St. Louis*, 883 S.W.2d 568, 569 (Mo.App.1994). The re-

quirements of a properly drafted motion for summary judgment are not negated by incorporating by reference a memorandum of law. *Koman v. Kroenke*, 913 S.W.2d 108, 110 (Mo. App.1995) (*citing Finley v. St. John's Mercy Medical Center*, 903 S.W.2d 670, (Mo.App. 1995)). Furthermore, "[i]t is not the function of an appellate court to sift through a voluminous record, separating fact from conclusion, admissions from disputes, the material from the immaterial, in an attempt to determine the basis for the motion." *Miller*, 892 S.W.2d 387 at 389 (*citing McCarthy v. Community Fire Protection District*, 876 S.W.2d 700, 703 (Mo.App.1994)). The court went on in *Miller* to state:

> Because the purpose underlying the rule is directed toward benefitting trial and appellate courts to expedite the disposition of cases, noncompliance with these requirements is not a matter subject to waiver by a party. To hold otherwise would place the court in the position of performing the work of an advocate. 'This court should not encourage noncompliance with that requirement [of rule 74.04] by performing a function properly that of counsel.'

*Id.* Compliance with Rule 74.04 must be tempered by whether or not the underlying purposes of the rule have been met. If the issues are clear to the parties, the trial court and the appellate court, failure to strictly comply with the rule does not, *per se* preclude the granting of a summary judgment and/or its affirmance by an appellate court. *AgriBank FCB v. Cross Timbers Ranch, Inc.*, 919 S.W.2d 263, 267 (Mo.App.1996) (*citing Mathes by Mathes v. Nolan*, 904 S.W.2d 353, 355 (Mo.App.1995)).

In this case, FMC and Halferty did not follow Rule 74.04(c)(1), making it difficult to determine precisely what facts were uncontroverted. However, an examination of this voluminous record makes it clear that there are no genuine issues of material fact and that the trial court erred in granting sum-

---

1. Motions for summary judgment shall state with particularity in separately numbered paragraphs each material fact as to which the movant claims there is no genuine issue, with specific references to the pleadings, discovery, or affidavits that demonstrate the lack of a genuine issue as to such facts. Each motion for summary judgment shall have attached thereto a separate legal memorandum explaining why summary judgment should be granted and affidavits not previously filed which are relied on in the motion.

mary judgment in favor of FMC and Halferty.

## IV. Conversion

■ Appellant alleges that Halferty and FMC converted the combine in question. Conversion can be proved in one of three ways: (1) by a tortious taking; (2) by the use or appropriation to the use of the person in possession indicating a claim in opposition to the rights of the owner; and (3) by the refusal to give up possession on demand. *Minton v. Hill*, 944 S.W.2d 250, 253 (Mo.App. 1997) (*citing Centerre Bank Nat. Ass'n v. Missouri Farmers Ass'n*, 716 S.W.2d 336, 341 (Mo.App.1986)). For Moore to recover under any theory of conversion, it must show that at the time of the alleged conversion they were the owner of, or had the right to possession of, the combine. *Id.*

In this case, the only issue with regard to the alleged conversion is whether Appellant had a right to possession of the combine at the time of the repossession by Halferty and FMC. Appellant claims it had a right to possession of the combine at the time of the repossession, while Respondents claim that Moore did not have such a right to possession.

We conclude that Moore did have a right to possession of the combine at the time of the repossession by Halferty and FMC.

## V. Alleged sale from Moore to Nance
### A. § 400.2–403

■ Appellant claims that the transaction between Moore and Nance, which resulted in McConkey obtaining possession of the combine, allowed McConkey to obtain nothing better than void title. Respondents counter that McConkey obtained voidable title and could transfer good title to a "good faith purchaser for value" under § 400.2–403[2], a sales provision of Article Two of the Uniform Commercial Code (UCC). Respondent, FMC, also claims that Halferty obtained good title from McConkey as a "good faith purchaser for value." Although Halferty does not claim on appeal to be a "good faith

purchaser for value," FMC invites this court to make that conclusion.

Respondents base their claim that Halferty was a "good faith purchaser for value" on § 400.2–403(1), which provides:

A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase *the purchaser* has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which was later dishonored, or

(c) it was agreed that the transaction was to be a "cash sale", or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

(emphasis added). Respondents argue that this section means that McConkey acquired voidable title because "when a transferor has been deceived as to the identity of the purchaser, the purchaser obtains voidable title, with the power to transfer to a good faith purchaser for value." However, a proper interpretation of § 400.2–403(1) inevitably leads us to the conclusion that McConkey did not receive voidable title; he received no title.

In order for McConkey to have voidable title under § 400.2–403(1), he must have received the combine "delivered under a transaction of purchase" and he must have been a "purchaser." There is no doubt that the contract between Appellant and Nance was a "transaction of purchase." However, the question remains: Was McConkey a "purchaser?" There was no "transaction of purchase" between Appellant and McConkey, for Appellant sought to contract with Nance, not McConkey. Whatever McConkey was, he was not a "purchaser."

Respondent Halferty, claiming that McConkey was a "purchaser" argues, "Moore

2. All statutory provisions are to **RSMo 1994,** unless otherwise noted.

thought Nance was the purchaser. But *Moore* was deceived because in actuality McConkey was the purchaser." Halferty maintains that Moore was "deceived as to the identity of the purchaser." Appellant was deceived, but not as to the identity of the purchaser. Nance was the purchaser. To claim that McConkey was a "purchaser" makes no sense under these facts. McConkey's sole intent was to steal the combine. He never intended to pay for the machine.

 Section 400.1–201(33) defines a "purchaser" as "a person who takes by purchase." Section 400.1–201(32) defines "purchase" as "includ[ing] taking by sale . . . or other voluntary transaction creating an interest in property." Section 400.2–106(1) tells us that "a 'sale' consists in the passing of title from the seller to the buyer for a price." Section 400.2–103(1)(a) defines a "buyer" as "a person who buys or contracts to buy goods." Section 400.1–201(11) defines a contract as "the total legal obligation which results from the parties' agreement as affected by this chapter and any other applicable rules of law." It follows that a "purchaser" is a person who is a party to a contract for sale and who agrees under the contract to buy certain goods. McConkey, by contrast, is not a party to any agreement or contract with Appellant. McConkey did not agree to buy or contract to buy the combine from Appellant. Further, McConkey and Moore did not contemplate the passing of title from Appellant to McConkey. McConkey is simply not a "purchaser." If there were a "purchaser" under the first contract, it would be Nance.

Respondents have misinterpreted the meaning of this UCC section. By the terms of § 400.2–403, the only person with the power to transfer voidable title is the "purchaser." Since McConkey is not a "purchaser," § 400.2–403 is inapplicable to McConkey, and McConkey cannot therefore have acquired voidable title. Nance is the only person that could be considered a "purchaser."

### B. § 164 of the Restatement (Second) of Contracts

 Respondent Halferty also relies on § 164 of the Restatement (Second) of Contracts (1997), which states the following general principle: "(1) If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is *voidable* by the recipient (emphasis added)." In other words, if one of the parties to a contract has made a fraudulent misrepresentation to induce the other party into the contract, then that contract is voidable. The Restatement does not say that the contract is voidable if someone not a party to the contract has committed the fraud. McConkey was not a party to the contract; he merely defrauded Appellant to acquire possession of the combine. Respondent Halferty emphasized the wrong word in the Restatement. He should have quoted thus, "If a party's manifestation of assent is induced by either a fraudulent or material misrepresentation *by the other party* . . ." (emphasis added). By its terms, § 164 does not apply to the facts of our case.

### C. Case Law

Respondents also rely on *Landshire Food Service, Inc. v. Coghill,* 709 S.W.2d 509 (Mo. App.1986) for their argument that McConkey had voidable title. However, we find that case unpersuasive. Like all of the cases cited for the proposition that McConkey had voidable title, *Landshire* involves a transaction between two parties to a transaction, between a buyer and a seller, or between a transferor and a purchaser. In our case, the seller or transferor was Appellant and the buyer or purchaser was Nance. McConkey was not a party to the transaction of purchase. Furthermore, the *Landshire* decision rested firmly on the fact that the property involved was an automobile with a certificate of tile. "Where the original owner, although induced by fraud, has voluntarily given to another *apparent* ownership in the motor vehicle, a bona fide purchaser, who has *relied upon that person's possession of the certificate of title* and of the vehicle, is protected." *Id.* at 512 (emphasis added). Our case is different. First, combines do not have certificates of title. Second, there is no apparent ownership of the combine by McConkey. Moore, the original owner, did not voluntarily give McConkey anything.

Halferty also relies on the following quote from *Landshire* : "The person who procures title through fraud receives voidable title and is able to transfer good title to a bona fide purchaser." *Id.* Halferty argues that McConkey "procured title" in this transaction. If anyone procured title, it was Nance. McConkey procured nothing. This is consistent with both § 400.2–403 and § 164 of the Restatement (Second) of Contracts. Section 400.2–403 requires a "purchaser" and § 164 requires a "party." McConkey is not a "party" to the contract, nor is he a "purchaser."

As if to emphasize how *Landshire* is distinguished from the present case the court in that case notes: "[a]s an aside, we note that this rule is not inconsistent with the established rule that a subsequent purchaser of a stolen vehicle does not obtain good title, notwithstanding the fact that such purchaser may be innocent of any wrongdoing." *Id.* *Landshire* deals with fraud between the parties to a contract. It does not deal with a third person, a non-party, who commits fraud upon one or both of the parties to a contract. McConkey was not a party to this contract. He defrauded Appellant and Nance as a third party. *Landshire* does not apply.

Respondent Halferty's reliance on several other cases to prove that McConkey had voidable title is also misplaced. Halferty relies on *Cottonhill Investment Co. v. Boatmen's National Bank,* 887 S.W.2d 742, 744 (Mo.App.1994), for the proposition that a party who has been fraudulently induced to contract may elect to enforce or rescind the contract. This case is also distinguishable from the case at hand. As in *Landshire*, the fraud complained of in *Cottonhill* is between the parties and not, as in our case, perpetrated by a third person not a party to the contract. Halferty next relies on *Farm Bureau Mutual Insurance Co. v. Carr,* 215 Kan. 591, 528 P.2d 134 (1974). *Carr* is also distinguishable from our case because the court in *Carr* held that the person who swindled the owner out of the car had committed theft and that the swindler acquired no title. *Id.* at 140. If this stands for anything, it would lead us to the conclusion that McConkey was a thief and acquired no title.

Halferty relies on *Kotis v. Nowlin Jewelry,* 844 S.W.2d 920 (Tex.Ct.App.1992), in which one Sitton purchased a watch with a forged check, and by the time the check was dishonored, Sitton had resold the watch. The court noted that "a thief who wrongfully takes the goods against the will of the owner is not a purchaser." *Id.* at 922. "On the other hand, a swindler who fraudulently induces the victim to deliver the goods voluntarily is a purchaser under the code." *Id.* The court went on to say, "[w]here goods are stolen such that there is no voluntary transfer, only void title results." *Id.* at 923. The court ultimately found that it was a voluntary transfer but only because the swindler was part of the transaction of purchase, unlike our case where the swindler was not a party to the transaction. Lastly, Halferty relies on *Foley v. Production Credit Association,* 753 S.W.2d 876 (Ky.App.1988). However, this is another case where the fraud was committed by one of the parties to the contract. The court in *Foley* gives the following explanation of § 400.2–403: "The entire concept of voidable title is logical and appropriate in that if a seller cloaks a *buyer* with indications of ownership, then anyone who subsequently purchases from that *buyer* has a right to rely on those indications, even if the original seller eventually proves to have been the victim of some fraud." *Id.* at 879 (emphasis added). For *Foley* to be applicable to our case, McConkey would have to be a buyer. As we know, McConkey is not a buyer.

McConkey is neither a buyer nor a purchaser. He was not involved in a voluntary transaction with Moore, where Moore delivered to him the combine and the indications of ownership. McConkey cannot be said to be a "purchaser" under § 400.2–403, nor can he pass good title to a good faith purchaser for value.

McConkey is merely a thief. Halferty has correctly noted that McConkey did violate the "stealing" statute in Missouri, to wit, § 570.030 which states: "A person commits the crime of stealing if he appropriates property ... of another with the purpose to deprive him thereof ... by means of deceit ..." Halferty agrees that McConkey stole the combine from Appellant. To gain pos-

session by stealing means that the possession was not voluntarily given and therefore, no title was conveyed. There are no Missouri cases construing the title of a thief pursuant to § 400.2–403. Common sense, as well as cases from other jurisdictions, however, lead us to conclude that a thief has no title. *Underhill Coal Min. Co. v. Hixon*, 438 Pa.Super. 219, 652 A.2d 343, 346 (1995), provides that "a converter has no title at all, *i.e.*, his title is void, and therefore he can convey nothing to a bona fide purchaser for value." The court in *Underhill* further concludes that this decision is consistent with decisions in other jurisdictions where the interplay between § 400.2–403 and the common law of conversion has been at issue. *Id.* In *Suburban Motors Inc. v. State Farm Mutual Insur. Co.*, 268 Cal.Rptr. 16 (Cal.App.1990), the court held that larceny is an involuntary transfer and results only in void title. *Id.* at 18. "If the goods are stolen or otherwise obtained against the will of the owner, only void title can result." *Id.* at 19. Since McConkey gained possession of the combine by stealing, he gained no title to the combine. *See also Pate v. Elliott*, 61 Ohio App.2d 144, 400 N.E.2d 910 (Ohio App.1978) (A thief has void title); *Candela v. Port Motors*, 208 A.D.2d 486, 617 N.Y.S.2d 49 (1994) (Car thief is not a "purchaser" for the purposes of UCC Section 2–403); *Olin Corp. v. Cargo Carriers, Inc.*, 673 S.W.2d 211 (Tex.App.1984) (One who purchases stolen property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner); *Farm Bureau Mutual Insurance Co. v. Carr*, 215 Kan. 591, 528 P.2d 134 (1974) (Cited by Respondents, stands for the proposition that a thief is not a purchaser and where goods are stolen, only void title results). As a thief, McConkey acquired no title.

### D. Moore's Title

■ Appellant was never divested of his title. Moore intended to contract with Nance, but no contract with Nance was ever consummated. The essential elements of an enforceable contract are 1) parties competent to contract; 2) a proper subject matter; 3) legal consideration; 4) mutuality of agreement, and 5) mutuality of obligation. *L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo.App.1995) (*citing Computer Network Ltd., v. Purcell Tire and Rubber Co.*, 747 S.W.2d 669, 675 (Mo.App.1988)). The contract was intended to be between Moore and Nance. Nance, on the other hand, never knew about the contract. There can be no mutuality of agreement if a putative party is unaware of the agreement. Halferty glosses over this problem by arguing, "there was mutuality of obligation and agreement because Moore could recover from McConkey." Halferty seems to imply that there was a contract between Appellant and McConkey. However, there was no contract between Appellant and McConkey, for McConkey had no agreement with Moore, and McConkey never intended to pay for the combine. McConkey merely intended to steal the combine from Moore, which, as Halferty agrees, is exactly what McConkey did.

The purported sale from Appellant to Nance was a nullity. Nance got nothing because the contract between Moore and Nance was never accomplished, for it lacked mutuality of agreement. Nance received no title; McConkey received no title. Title, therefore, remained in Appellant.

### VI. McConkey and Halferty / FMC's

### Retail Installment Contract and Security Agreement

After McConkey obtained possession of the combine he went to Halferty to obtain a loan. Halferty agreed to loan McConkey money. In return, McConkey agreed to grant Halferty a security interest in the combine. However, McConkey and Halferty did not sign "loan" documents but rather a "retail installment sales contract," which showed Halferty as the "seller" and McConkey as the "buyer" of the combine.[3] This documen-

---

3. FMC and Halferty claim that McConkey had a "voidable" title and therefore could pass good title to Halferty. However, Halferty appears to be selling the combine to McConkey and not vice versa. This subterfuge would strip Halferty of his position as a good faith purchaser for value, even if McConkey had voidable title, which he does not. Further, although Respondents argue Halferty was a good faith purchaser, FMC tried to take an assignment of a security interest which

tation was used to obtain money from FMC: Halferty assigned the retail installment contract/security agreement to FMC; in return, Ford gave Halferty a check; Halferty then gave McConkey the "loan."

## A. Article 9—The Security Interest

■ Unlike the issue of title, which is governed by Article 2 of the UCC, the effect of the security interest given by McConkey to Halferty and assigned to FMC is governed by the provisions of Article 9 of the Uniform Commercial Code (UCC). *Community Bank of Chillicothe v. Campbell,* 813 S.W.2d 40, 43 (Mo.App.1991). For a security interest to be enforceable, the debtor (McConkey) must have acquired sufficient rights in the collateral for the security interest to attach. *Id.* Even though a security interest exists, it is not enforceable against third parties with respect to the collateral and does not attach until three conditions coexist.[4] *First Tennessee Bank, Nat. Ass'n v. Graphic Arts Centre, Inc.,* 859 S.W.2d 858, 863 (Mo.App.1993). The conditions are:

> (a) the collateral is in the possession of the secured party ... or the debtor has signed a security agreement ...;
>
> (b) value has been given; and
>
> (c) the debtor has rights in the collateral.

*Id.;* § 400.9–203(1).[5] Therefore, the issue in this case is whether McConkey had sufficient rights in the collateral for the security interest of Halferty/FMC to attach. If he did have sufficient rights in the collateral, the security interest would have attached and would be enforceable. If he did not have sufficient rights in the collateral, then the security interest would not be enforceable.

## B. Rights in the Collateral

■ Neither the Model Code nor Missouri's Uniform Commercial Code define

"rights in the collateral." *First Tennessee Bank, Nat. Ass'n,* 859 S.W.2d 858 at 864. Commentators suggest that the debtor's "rights in collateral" are not determined by Article 9 of the Code. *Id.* Rather, we must look to Article 2, the common law, and other rules to determine whether there are sufficient "rights in the collateral" for a security interest to attach. *Id.* Professors White and Summers are quoted in *First Tennessee Bank* to the effect that:

> "rights in the collateral" language merely states a truism, namely, that the debtor normally can only convey something once it has something, and that something may be less than the full bundle of rights that one may hold in such property. The "rights in the collateral" language is a gateway through which one looks to other law to determine the extent of the debtor's rights, and thus the interest the debtor can grant to a third party by way of a security interest.

*Id.; see* 4 J. White & R. Summers, Uniform Commercial Code, § 30–11, at 75 (4th ed.1995).

Thus, our inquiry begins with Article 2 of the UCC to determine what rights in the collateral McConkey had when he signed the security agreement. We can find no provision of Article 2 which would give McConkey any rights in the collateral except those provisions which would require McConkey to be a buyer or a purchaser. Our previous analysis shows that McConkey is neither a buyer nor a purchaser. Article 2 affords him no rights in the collateral.

Since neither Article 9 nor Article 2 affords us a definition of "rights in the collateral," we heed the admonition of the UCC that it be liberally construed and applied. § 440.1–102(1). "Unless displaced by the particular provisions of this chapter, the princi-

---

Halferty, allegedly obtained as a *seller,* not a *buyer.*

4. The term "attachment" is a term of art. "Attachment" with respect to a security agreement relates to the creation or coming into existence of a security interest. A security interest does not attach and cannot be enforced unless the conditions of UCC 9–203 have been satisfied. The Code subjects the concepts of enforceability

and attachment to compliance with the same standards. A security agreement cannot be perfected before it has attached. **68A Am.Jur.2d Secured Transactions § 267, 268 (1993); § 400.9–203.**

5. The application of § 400.9–113 to the case at hand was evaluated and determined not to be a factor. *See* **4 J. White & R. Summers, Uniform Commercial Code, § 30–11, at 75 (4th ed.1995).**

ples of law and equity shall supplement the Code provisions" § 400.1–103. Thus, we look to the common law to determine whether McConkey had any rights in the combine sufficient to allow a security agreement to attach under the provisions of § 400.9–203.

Although a few Missouri cases have addressed the issue of when a debtor acquires rights in collateral sufficient to support the attachment of its creditor's security interest, none has addressed this issue in a way that resolves the case at bar. In *Alpine Paper Co. v. Lontz,* 856 S.W.2d 940 (Mo.App.1993), the Eastern District found that rights in the collateral sufficient to support attachment of a security interest did exist, but that case turned on the fact that the debtor had purchased the collateral in question. Thus, *Alpine Paper* does not apply to our case, where the debtor (McConkey) did not purchase the collateral.

In *Central Production Credit v. Hopkins,* 810 S.W.2d 108 (Mo.App.1991), the Southern District found that the debtor did not have rights in the collateral sufficient to support the attachment of a security interest. In that case, the debtor had bid at auction for 88 head of cattle, but never received delivery of the auction tickets or the cattle. In our case, the debtor (McConkey) did have possession, albeit unlawful possession, of the collateral.

In *Community Bank of Chillicothe,* 813 S.W.2d 40, the Western District found that the debtor had sufficient rights in the collateral (farm machinery) to support the attachment of the creditor's security interest, where the debtors had purchased the property, had signed the security agreement, had used the equipment in farming for several years and had named the equipment as part of their property in a bankruptcy proceeding. Again, since the debtor was a purchaser, this case does not apply to our case.

The *Community Bank of Chillicothe* case and the *Alpine Paper* case relied heavily on *Fricke v. Valley Production Credit Ass.,* 721 S.W.2d 747 (Mo.App.1986), wherein the Eastern District determined as a matter of law that the debtor had sufficient rights in cattle purchased with a partner's money to create a security interest in the cattle which prevailed

over the ownership claim of that partner. *Id.*

All of these Missouri cases stand for the proposition that title is not the relevant concern where parties' rights are governed by Article 9. However, none of these cases addresses the question of what rights in collateral a debtor has when he signs a security agreement granting a security interest in collateral, possession of which he gained by stealing—and whether those rights, if any, are sufficient to support the granting of a security interest.

McConkey obtained the combine by stealing it from Moore Equipment Company by the deceitful act of forging Nance's signature. McConkey's stealing of the combine conferred upon him no rights in the combine. This determination is based on the previous analysis of this court as well as case law from other jurisdictions. "Where there is a paucity of Missouri case law interpreting a provision of the UCC, courts of this state look for guidance to decisions of other jurisdictions made under the same provision." *Robinson v. Citicorp National Services, Inc.,* 921 S.W.2d 52, 54 (Mo.App.1996). Generally, mere possession of goods is not sufficient to demonstrate "rights in the collateral" under the Code. *First National Bank of Santa Fe v. Quintana,* 105 N.M. 410, 733 P.2d 858, 860 (N.M.1987); *Rohweder v. Aberdeen Production Credit Ass'n,* 765 F.2d 109 (8th Cir. 1985). In *Pleasant View Farms, Inc. v. Ness,* 455 N.W.2d 602, 604 (S.D.1990), the court noted that while full ownership by the debtor is not necessary, a security interest will only attach to the collateral to the extent of the debtor's rights. *First Nat. Bank v. Avondale Mills Bevelle Emp.,* 967 F.2d 556, 559 (11th Cir.1992), involved an employee of a credit union who had obtained loans through a bank and offered a share certificate of deposit from the credit union as collateral. In reality, the defendant had filled out the blank CD and never paid for it. The court said, "[t]hough Caldwell was a prolific thief, the fact remains that as a thief her title was void and she had insufficient rights to grant an enforceable security interest in the share CD." *Id. First Southern Ins. v. Ocean State Bank,* 562 So.2d 798, 799 (Fla.Dist.Ct.

App.1990), involved an employee who was entrusted with his employer's automobile. The employee induced an automobile dealer to alter the title document to list him as the owner of the vehicle. The employee then used this document to give Ocean State Bank a security interest in the automobile as security for a personal loan. When the employee defaulted, the bank asserted a claim to the automobile. The court determined that the employee had no ownership rights in the automobile and that the true owner had not authorized him to use the vehicle as security. The bank's security interest was found to be invalid, "because the debtor, a thief, had no rights in the collateral." *Id.* at 799. The court went on to say, " '[t]hus the requirement that there be 'rights in the collateral' illustrates the general principle that 'one cannot encumber another man's property in the absence of consent, estoppel or some other special rule.' " *Id.*

The *Rowheder* case is particularly instructive because the court found that the debtor was a true bailee and entitled to mere possession. The court noted that, "We are aware of no case in which the interest of a genuine bailee was sufficient to support the attachment of a security interest." *Rohweder*, 765 F.2d at 112. The courts are uniform in this conclusion. *See* Joseph W. Turner, *Rights in Collateral Under UCC Section 9–203*, 54 Mo LR 677, 686–90 (1989). The best that McConkey could hope for would be to analogize himself to a bailee, claiming that he had a right to possession. However, even that argument would not hold up under the circumstances of this case.

McConkey's fraudulent procurement of the combine merely gained for him unlawful possession of the combine. If Halferty and FMC's security interest could only attach to the combine to the extent of McConkey's rights, then their security interest did not attach at all. McConkey was a thief. A thief acquires no rights in stolen collateral.

Since the debtor (McConkey) has no "rights in the collateral," the security interest obtained by Halferty and assigned to FMC never attached. § 400.9–203.

## VII. Conclusion

Because the security interest never attached, Halferty and FMC had no right to possession of the combine when they repossessed it on March 26, 1992. Further, since Moore was never divested of title before March 26, 1992, it was the rightful owner of the collateral at the time of repossession by Halferty and FMC.

We find that the contract entered into by Moore and Nance was a nullity, because of the lack of mutuality of agreement of the parties; that McConkey was not a "purchaser" since he stole the combine from Moore. We hold that McConkey acquired no title under the transaction between Moore and Nance; that Moore was never divested of title; and that McConkey never acquired rights in the combine. We further hold that the security interest held by Halferty and assigned to FMC never attached and was never enforceable. To conclude otherwise would be to further the wrongdoing which permeates this entire case. The summary judgment granted in favor of Halferty and Ford Motor Credit is reversed. Summary judgment is entered in favor of Moore Equipment. **Rule 84.14.** The cause is remanded to the trial court to determine the issue of damages.

All concur.